May it please the Court, Counsel. Good afternoon, Your Honors. Richard Whitney representing Petitioner-Appellant Christopher L. Rollins, who contends that the trial court committed manifest error in dismissing his post-conviction petition after a third-stage hearing. Our argument is largely, though not entirely, based on this central proposition. When you introduce proof showing that the testimony of a witness was inherently incredible, you cannot logically conclude that this had no significant impact on her credibility. And when a trial court declares otherwise, essentially waving off compelling evidence, refuting the testimony of that witness, in this case the only witness who contended that Mr. Rollins committed the act for which he was convicted, and on that basis dismissed the petition and confirmed the conviction, well, it's then the credibility of the court and ultimately our legal system that suffers. If the Court will indulge me for a moment with a hypothetical that I think is analogous to this case. Suppose for a moment that I were charged, tried, and convicted of an act of vandalism for breaking a storefront window. I have two witnesses who said, no, he didn't do it, it was the store employee who broke the window. The store employee says, no, I saw Mr. Whitney, he broke the window and then he ran away. Now suppose further, I tell my trial counsel, hey, I had just had hip replacement surgery the week before, I couldn't have done what she said. But the trial attorney doesn't introduce this evidence. The court decides, well, you have two witnesses, Mr. Whitney, but they were friends of yours, I find the store employee more credible. And on that basis, I'm convicted. I come back in a post-conviction petition, producing a doctor's report saying I did have hip replacement surgery the week before, I couldn't have done what I was accused of doing by the storefront employee. And on top of that, I can show that my attorney had this information beforehand and didn't introduce it. Now in that circumstance, I would presume this court would agree with me, yeah, that was manifest error. When you have proof that compelling that you couldn't have done it, you can't turn around and say that the state's chief witness doesn't affect her credibility at all. That makes no sense. That does rise to the level of manifest error. In this case, in Mr. Rollins' case, the facts are a little more complicated, but that's essentially the same paradigm, the same pattern. Tessa Leach's testimony was that Mr. Rollins doused her with a highly flammable fluid, lit the lighter that set her on fire, and then he and witnesses Joplin and Riddle immediately ran out of the house, that was the court's finding, before she did. Yet in the post-conviction proceeding, Mr. Rollins presented evidence from a state arson investigator who had no incentive to help exonerate him, showing that the jug containing the fluid was found in the back of the house in a utility room that was only accessible from the inside of the house, because the back door had been nailed shut and had been blocked off. Mr. Whitney, how could that even possibly happen? Well, that's the question I'm presenting, Your Honor. The only way it could have would have been if we were to accept that Lily ran outside the house and then ran back in the house through the fire, through the utility room. And somebody locked or nailed shut the door? Yes. There's not time for all of that, right? Right, exactly. So could it be that that's not the container of fluid? Did anybody ever identify that? Well, and I know the state makes this argument, but there is absolutely zero evidence that there was another container of fluid. But is there any evidence that the arson investigator looked for in the record? There is no direct evidence of that, but we know that they did a complete investigation. They surveyed the property. There were police there. There was fire there. There was a lot of people in there. A lot of people looking around. And there was a lot of commotion going on, because you have a woman who was badly burned and rolling around in the grass. So there's a lot of commotion, including the witnesses running away from the victim, right? That is part of what happened, yes. So my question is, isn't it just as feasible that this was not the liquid that he used? I would say no, Your Honor, because all of the witnesses identified the state's exhibit. And this was the state's theory, too, that he just wants to look with, right? But now we're on post-conviction. I'm sorry? We're in a post-conviction state.  And we've got a hearing going on. And we've got the fire inspector going on. And all he testifies to is what he sees, which is this liquid in an area that's nailed shut. And it's inconceivable that there was time to nail it shut from the outside, right? Well, no, there wasn't. Nobody's contending it was nailed shut at that time. But the testimony of Joplin, Riddle, and Mr. Rollins through his video statement was that he, after he poured the liquid on her, he went back through the kitchen to return the jug before Tessa Leach lit herself on fire. And it was... And does he say that it was that pantry and that jug? Did he say that? Yes. I don't think that he specifically identified it, but he did say he went to take it back. And then he went... That's as much as we know. He went back in the kitchen area, right? Or actually, we're not sure where he went back to, I think. Well, the utility room was in the direction of the kitchen area. The two witnesses said he went back that way. One of them, I believe it was Riddle, said that there was a delay between the time that he poured the liquid on Leach and the time she lit herself on fire. His testimony was that they maybe said two more sentences between them. They were arguing. Right. How much time? Two sentences? Right. But that's enough time to go through two and a half rooms, put it on the shelf, she lights herself on fire, he comes running back in. That's what he said happened. That's what Joplin and Riddle say happened. But the court does not find them credible, right? The two witnesses. Right. Because they... Led his way. Right. The court says he finds them less credible for a number of reasons. Some of which, by the way, illustrate that the court did commit errors of fact in evaluating the evidence of this case, and this is something else that Attorney Roland should have brought to the court's attention. For example, one of the reasons it found Riddle and Joplin not credible was its finding that neither of them remained at the scene or went to the police to give a statement. However, Joplin's testimony was he only left the scene to go to a neighbor's house to call 911. Why does that badly impact his credibility? And in addition, the police reports attached to Mr. Roland's post-conviction petition show that both of these witnesses did give statements to the police, and that Riddle went to the West Frankfort Police Department on his own volition to give a statement, completely contrary to the conclusion that the court drew. When did he go? When did he go to the police station? It was the same day. It doesn't say exactly when, or at least I don't believe it says exactly when. We know it's the same day, though. Yes. He went on his own volition to give a statement, and that's part of the record. This is part of what Attorney Roland failed to do. He didn't file a motion to reconsider calling attention to the court's error. And again, we're arguing cumulative error here. We look at the entire record. Not only did Roland fail to introduce this compelling evidence that Nietzsche's story was not credible, he also failed to introduce the evidence about the cell phone record, which would put Mr. Roland in a different light. He also didn't introduce the other evidence that would have helped him. And his cross-examinations were all perfunctory. As a matter of fact, when he cross-examined Leach, he actually had her repeat her testimony that none of these people tried to help her. Now, I know there's a strong presumption of sound trial strategy in these cases, but what kind of sound trial strategy is it where you introduce no evidence on behalf of your client even though you have compelling evidence that favors your client? You only perform perfunctory cross-examinations. Roland, in his concluding remarks, actually said that the mere act of pouring a liquid on Leach made it a Class X felony, even though Mr. Rollins himself had given him case law showing that this was not the case and the court had to correct him on this point. This was the performance we're dealing with here. I see I'm out of time. Go ahead. You can finish your thought. Well, basically, when we look at the totality of the evidence, there is a pattern of cumulative error. I know there's a strong presumption of sound trial strategy, but where is it? If you can't even articulate what the strategy was, if you can't point to a single thing that Mr. Rollins did in support of his client, how can you presume there is a sound trial strategy, especially when you have compelling evidence that he had that he failed to introduce? Thank you for your consideration, Roland. Hold on one second. Oh, sure. Mr. Whitney, I guess I get back to whether the location of this container in the pantry was really deemed significant by the trial court. I mean, this was a meth lab, correct? Well, there were allegations. I don't think that there were. And he ultimately admitted that they had been making meth in the house. So they're using this liquid to make meth, right? Well, that's a presumption. We don't know that, but that would be... And so we know the defendant afterwards is outside running around and perhaps he could have concealed the actual bottle he used. And did the defendant not give conflicting statements about what he did with that bottle? Didn't he at one point say he went to the kitchen with it? He made a statement to the effect that he went to the kitchen, but that was relatively minor. He could have meant he went through the kitchen, which you would have to do to get to the utility room. And again, the only other witness, the witness from across the street, only saw him with a cell phone. Didn't see him holding a jug or dispensing with a jug. You have police all over the place. Where is this other jug? And again, all the witnesses identified that same jug as being, yes, that looks like the one he used. So when you add it all up, sure, is it possible? Yes, it's possible there was another jug, but I think it's highly unlikely when you look at the total picture. No questions. Okay, thank you, Mr. Whitney. You'll have a few minutes after Ms. Jones speaks to us. Thank you. All right. Ms. Jones, good afternoon. Good afternoon, Your Honor. May I please report, counsel? My name is Kara Jones, and I'm here on behalf of the state. I want to get right to this issue with regards to Fire Marshal's report. The Fire Marshal's report, they argue, would have undermined the testimony or the credibility of Leach. Leach's testimony and what she said occurred was consistent. Leach said, and of course the facts leading up to when he doused her after saying he was going to burn her and the whole house down are undisputed. It's what happened after he doused her that is disputed. Leach testified that he came into the room, he doused her with it, and he immediately lit her hand on fire, and then he and his friends left the room. Now, there was also other testimony that supported her statements at trial. There was a witness who arrived on the scene and went to her to assist her, and she said, Leach told her, he set me on fire. And that person is identified as the defendant. When the police arrived before she got in the ambulance, and then of course became unconscious and was unconscious for a couple months because of the burdens she sustained, she told the police that the scene that the defendant set her on fire. That was all consistent. Her statements immediately after this happened and her statement on the stand were consistent. Now, let's look at the defendant. His statements are less than consistent. In fact, he isn't even consistent about where he got the jug that he used to douse her with. He couldn't keep his story straight. First, he stated that he obtained the container from under the kitchen counter. And he said, no, I obtained it from the pantry. Which is a kitchen pantry. And at no time in his recorded interview did he specifically state that he returned the container to the pantry. Nor was there any evidence to support this. First, he said he splashed it on her legs. And as soon as he walked out of the room, his friend said that she was on fire. So he turned around and freaked out because she was burning from head to toe. Later, he said he took the container back to the kitchen. The third statement, he said he splashed it on her and then went and put it back up. But did not specifically state where he went to put it back up. Well, he said he got it from the kitchen, he said he got it from the pantry. So when he went to put it back up, which one? Where did he go? But despite defendant's arguments otherwise, neither Riddle nor Jocelyn testified the defendant returned the container to the pantry. They couldn't. They stayed in the living room. They didn't see where it went. And everyone, including the defendant, says he, as soon as she left the room, he immediately returned. Well, to believe that, if he immediately returned, how did he get to the pantry to put this container back? He either went to the pantry and he's lying about the fact that he immediately returned. Or he's lying that this was somehow the same chemical that he used to douse her with and it was back in the pantry. And in fact, if the defendant's attorney had used this layout, it actually would have undermined his credibility. It wouldn't have bolstered it, it would have undermined it. Because it would have specifically shown that he had to walk through the dining room, through the kitchen, through the pantry. And yet he's saying, I left the room and I immediately returned. Then you must be a track runner. Because if you can return, if you can run all the way through those rooms and put it back in its place, and then immediately, I mean, what is the definition of immediate? He, you know, basically said, I knew that he returned and I tried to put her out. His testimony is not credible. It's inconsistent. Furthermore, as the court has pointed out, there's actually no evidence that the jug that they found in the pantry was in fact the same jug of chemical that he used to douse her with and before he set her on fire. The evidence in this case was that he, there was meth making items found in that pantry. When questioned by officers immediately after this, he denied knowing that this was true. No, no one's picking meth in this house. I don't know of anybody who's picking meth in this house. Then we get to the third stage here. The third stage hearing, he admitted that he had obtained this cleaner, this cleaner, in order to make meth. Not just I was cooking meth, but I obtained this great cleaner to make meth. So it's reasonable to infer that there's more than one container of cleaner present in the house prior to him burning his girlfriend. And Fentz argues, well, no one found this additional jug that he must have ran out of the house with. He says, no one saw the defendant outside the house with a jug. Well, no one was there when he immediately ran out of the house. The witnesses that arrived on the scene afterwards testified that they were on a porch down the street. They weren't even alerted to this situation until they saw smoke. And they then ran down the street and found the defendant basically running between the alley, the road, across the road, and back across the alley, and into the yard, and was on his cell phone. And then after he was done this, he fled the scene. Now, earlier he testified that he had a motorcycle there, because when she got back, he wanted to make sure that he could catch who she was cheating with. So he got on that motorcycle and went down the street to see if he could find out who dropped her off. He didn't get on the motorcycle that clearly was there. He got into a complete stranger's vehicle. Held there in a car. Complete stranger. Can you take me to my friend's house? And then what did he do? She wasn't driving fast enough. So he fled from the car. He says he tried to go back, but there were too many police. Well, he didn't murder. Why didn't he walk up and say, this is what happened? He didn't. He fled. The report and the layout would not have affected Leach's credibility. In fact, it would have further undermined the defendant's credibility. So the defendant can't prove the credibility here. In fact, the court in its ruling specifically said, with regards to all of the issues, and remember, the judge, this is a bench trial, so the judge was the finder of fact. The judge was the one who determined the credibility at the original trial, and it was the same judge who was hearing the third stage post-conviction petition. And in the docket entry, the court specifically says, this court, who presided over the bench trial in this clause, and specifically found that the testimony of the victim in this matter was credible, in its findings, can state that the issues which defendant claims were not presented to the finder of fact in this case, related to credibility, would not have resulted in a different outcome in this court's ruling, that the defendant was proven, he writes guilty, he means guilty, beyond a reasonable doubt, defendant has failed to make the requisite showing of both counsel's deficient performance, and as a result, such efficiency outcome of the proceeding would have been different. So the court specifically made the finding that it would not have, none of the matters that the defendant presented would have affected credibility. With regards to the other claims, one thing that I do want to mention, the defense counsel talked about, you know, didn't challenge the failure to cross other witnesses or challenge court's factual findings with regards to the fact that the two witnesses weren't credible because they fled the scene and didn't talk to police. The defendant didn't raise either of those issues. They did not assert a claim of ineffective assistance of counsel on either of those bases, so I'd ask the court not to even consider that. Just briefly, I did raise issues with regards to race judicata, forfeiture, and waiver, and several of those issues they've conceded. The argument of cumulative error, there is no cumulative error because there is no error. Well, let me ask you about that. Do you think there can be cumulative error in a case like this, if there's one instance of error? No, Your Honor. I mean, cumulative means more than one. You can't have cumulative error unless you have more than one issue of error, and I believe the Supreme Court, with regards to plain error analysis, has essentially concluded that. And in plain error analysis, the Supreme Court recently held that if you find that there are not, in other words, if they raise four issues of error, and the court finds that, you know, three of those issues are not error, there is no cumulative error for purposes of plain error because you have to have more than one. Okay, and so what do you think, so Mr. Whitney has been arguing cumulative error, and what does the State believe that the issues of error are that he has raised? Well, he's raised four issues. One is a claim that the defense counsel failed to cross-examine the fire marshal with regards to his report. Is that error? Is that ineffective assistance of counsel? Well, no, Your Honor. I mean, whether you cross-examine or impeach somebody is a matter of trial strategy, and in this particular case, as I've just discussed at length, the use of that report actually would have undermined his own client's credibility. It wouldn't have undermined Leach's. So even if he had been asked to or even if he had decided, I mean, I think using the layout of this house would have actually been ineffective assistance of the counsel because it undermines the defendant's own testimony. I mean, his multiple statements. The second issue they've raised has to do with failing to impeach her. I'm sorry, Your Honor. That's okay. Because the reason I ask you that is I want to know the state's, I think you've covered them, but they've raised a lot of issues in there for you, some of which have been forfeited. The second issue was that the defendant failed to or that the trial counsel failed to investigate prior act of self-harm. Self-harm. But that was they've admitted that that's raised judicata because that was raised below. And the third issue, so that's not, that can't be raised. They've admitted it's raised judicata. Correct. So we're back to one. We're back to one. Okay. And then the third issue is the cell phone document or cell phone records, the fact that he didn't and that was twofold. One was that he would have refuted her testimony that she wasn't expecting the defendant to be home. And as I point out, once again, that's been waived or raised judicata. Well, I think they conceded that. Yes, they did. And then the second part of the cell phone records was that he tried to, well, and also, Your Honor, even if they hadn't conceded that, in order to impeach somebody, you have to first, the person first has to say something that is inconsistent and there's no evidence that she ever said that they didn't have a conversation. So there was nothing to impeach her about. So even if it wasn't waived, it was, there's no valid to it. And then the last one. One second. So I understand, Your Honor, about what they should have done, but they conceded that in this case. Correct. So that's not air. So we're back to one. Right. And then the second part of their issue with regards to the 911 calls is that they should have admitted the evidence or gotten the phone records to show that he did, in fact, call 911. But he testified he called 911. Or not testified, but he sent his recording several times. I tried to call 911, but I was so flustered that I kept dialing 9-9-1 instead of 9-1-1. But I've also argued, Your Counsel, that that issue has been forfeited because and they didn't concede that point. They didn't concede it, but that would have been bolstering his testimony with consistency. Correct. I mean, whether to call 911, I mean, their whole argument is all these points undermine Leach's credibility. Whether he called 911 or not has no bearing whatsoever on Leach's testimony or her credibility. Well, I'll ask Mr. Whitney, but I'm still back to one. Yes. I'm not seeing any other evidence. That's where my confusion was. Okay. Questions? No questions. Thank you. No, you all just took care of my questions. Thank you. Thank you. We would ask, Your Honor, that the that the court's ruling dismissing the third post-condition petition of the first stage be approved. Thank you. Thank you. Mr. Whitney? So I just want to start with, you argue cumulatively error when you came up here before, and I don't see where the cumulative nature of the error is that you're arguing. Well, it is the other claims and the other failings of counsel taken together. Now, opposing counsel cited to some Supreme Court case dealing with plain error analysis. We're not here on plain error analysis. I think she made that distinction. Right. We're here on a claim of ineffective assistance of counsel, and as I've cited in the briefs, the Stan case out of the Fourth District, citing Illinois Supreme Court case Mitchell, the issue of incompetency of counsel is always to be determined from the totality of counsel's conduct. So even though there was race judicata with respect to a couple of these claims, we are still allowed to ask the court to look at the big picture here. What did Roland do and primarily what he failed to do in its totality? And that does include the failure to get the cell phone evidence. It does include the failure to impeach or to introduce evidence prior to prior acts of self-harm. You're arguing that even if it's forfeited, that it can be considered as cumulative error. As a stand-alone claim that we didn't concede it was forfeited, that we said that we conceded it was race judicata, as a stand-alone claim, but you can still look at the big picture of all the things counsel failed to do in evaluating whether there was ineffective assistance of counsel. And Ms. Jones doesn't think you've raised the claim of ineffective assistance of counsel, which I thought you had raised. Right. I think we're maybe the state was looking at it a little differently, but you're raising ineffective assistance of counsel in the failure to do all of these things. Correct. It's deficient performance. Right. Both the issue of the Bamberos testimony and the other ones taken together, and incidentally the failure to correct the court about the reasons it found Riddle and Joplin to be credible when it said, well, they just fled the scene and they didn't go to the police. And I did sub to that in the opening brief. I didn't make it part of the argument, but I did highlight it on page 9, footnote 2, that the court did make this error in evaluating the evidence. So if we're looking at the totality of counsel's performance, and he's being handed a finding in the court saying, well, I didn't find these two witnesses credible because they didn't go to the police, and he has in his possession a police report saying they did go to the police, one of them went on his own volition the same day, why did he file a motion to reconsider? You know, Your Honor, you made an error of factor. We asked you to reconsider. Didn't do it. But he had used trial strategy not to do that based on the other overwhelming nature of the evidence? Well, I would dispute that it was overwhelming but that's part of the problem. He didn't call attention and at that point it wouldn't be trial strategy, it would be post-trial strategy What's there to lose at that point? You know, but you should file a motion to reconsider. Any reasonably professional attorney seeing that there was a conviction, hey, the court got this wrong you want to call it to the court's attention. You know, you need to evaluate. There was no testimony. Neither of these witnesses were asked did you go to the police? And yet somehow the court drew a conclusion that they didn't go to the police, therefore I find them less credible With respect to some of counsel's other points, yes, Tessa Leach's statements were consistent with each other, but that doesn't make her overall account more credible when again you have the fact that you know, the only way that jug would have gotten to the back room is if Mr. Rollins went back out, went back inside through the fire, went back through the fire twice. Doesn't make any sense No jug was found in the kitchen. No jug was found anywhere else. No one saw a jug anywhere else. And all the witnesses identified the jug as being, looking similar to the one shown in the If they had multiple jugs of the same brand, why wouldn't they look the same? Well, but there's no evidence. I mean, if you had police and arson investigators why would they all hone in on one jug if there was more than one? What I'm saying is that if this was a meth lab or meth operation they may have had multiple jugs and wouldn't they all look the same if they bought them at the same place? In other words, just because witnesses identified it as the jug, I mean, how would they know that that was in fact the jug? It was the same brand and type. Well, they wouldn't know to an absolute certainty, but there's consistency. And again, there's zero evidence that there was any other jug found at the scene. One would think that an arson investigator and police looking and collecting evidence would have made note of another possible source of the flames. With that in mind, we respectfully request that the order of the court dismissing Mr. Rollins' plan after a third stage hearing be reversed. Thank you. And reversed and do what, Mr. Whitney? Well, we would ask that it be reversed outright and relief be granted, but in the alternative we would ask that it be vacated and the clause reset for a new third stage hearing. Okay, thank you very much. Thank you, Your Honor. Thank you both for your arguments here today. This matter will be taken under advisement. We'll issue an order in due course.